# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| CARLOS A. WILLIAMS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 17 C 8613 |
| v. | ) | |
| | ) | Judge Sara L. Ellis |
| MEGAN J. BRENNAN, as Postmaster | ) | |
| General for the United States Postal Service, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

After the United States Postal Service ("USPS") terminated his employment in 2014, Plaintiff Carlos A. Williams filed this employment discrimination lawsuit against Megan J. Brennan, the Postmaster General for USPS. He contends that USPS engaged in race, color, national origin, and gender discrimination as well as retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; age discrimination in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; and disability discrimination under the Rehabilitation Act, 29 U.S.C. § 701 *et seq.*[1] USPS has filed a motion for summary judgment on Williams' complaint. The Court finds questions of fact with respect to whether USPS issued Williams a notice of removal in 2014 because of his race, gender, or national origin or in retaliation for his protected activity. But Williams cannot proceed on the remainder of his claims because he cannot establish that certain of the challenged incidents amount to actionable adverse employment actions or that one of his protected characteristics caused the actionable adverse actions to occur.

---

[1] Although Williams purports to bring his disability discrimination claim under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, the Court treats it as arising under the Rehabilitation Act because the ADA does not apply to federal agencies. *See Hancock v. Potter*, 531 F.3d 474, 478 n.4 (7th Cir. 2008).

## I.    Williams' Background and Initial Employment with USPS

Williams is an African American male born in 1972.  He identifies as a Moor and

Choctaw Indian.[3]  After working for USPS for some time, Williams received a career

appointment in 1997.  He worked as a mail processing clerk at the Palatine Processing and

Distribution Center from 1997 until 2010, when USPS reassigned him to the Glen Ellyn Post

Office as a letter carrier.  At the Glen Ellyn Post Office, Connie Principe, a Caucasian female

born in 1962, and John Walsh, a Caucasian male born in 1960 both supervised Williams.  James

Gillispie, an African American male born in 1963, served as the Glen Ellyn Postmaster.

Gillispie learned of Williams' Moor background sometime in 2010, but the record does not

indicate that Williams told anyone that he is Choctaw Indian.

In 2011, Williams joined an organization called the No Harassment Foundation, where

he, along with Anita Hatcher and Kenny Reed, helped USPS employees file complaints of

harassment, discrimination, and retaliation.  Williams testified that, at some point in 2012, Walsh

remarked that Williams thought he did not have to follow the rules because he was black.

During his time working at the Glen Ellyn Post Office, Williams filed over fifteen EEO

complaints against USPS, including around five against Gillispie, Walsh, and Principe.  This

includes an EEO complaint Williams filed against Walsh and Gillispie within about three months

---

[2] The facts in this section are derived from the Joint Statement of Undisputed Material Facts, Williams' Statement of Additional Facts, and USPS' responses thereto.  The Court has considered USPS' objections to the statements of fact and supporting exhibits.  It notes that many of the statements included in Williams' Statement of Additional Facts are not actually disputed and so should have been included as part of the parties' Joint Statement.  Although Williams therefore has run afoul of the Court's standing order on summary judgment practice, the Court nonetheless considers the statements and responses to the extent appropriately presented, supported, and relevant to resolution of the pending motion for summary judgment.  All facts are taken in the light most favorable to Williams, the non-movant.

[3] Williams testified that he considers being Moor and Choctaw Indian as one and the same.

after he transferred to the Glen Ellyn Post Office, after which Williams claims Gillispie's treatment of him changed. On April 29, 2014, an EEOC administrative law judge concluded that Walsh had retaliated against Williams for his protected EEO activity when Walsh issued Williams a notice of removal in 2010 based on the late delivery of express mail.

## II.     Holiday Pay

USPS' Employee and Labor Manual ("ELM") provides that, to receive holiday leave pay, an employee must be in a pay status either the last scheduled hour before or the first scheduled hour after the holiday. To the extent an employee is on extended leave without pay ("LWOP"), an employee cannot use paid leave for the last scheduled hour before or the first scheduled hour after a holiday to qualify for holiday pay.

Williams did not receive holiday pay for the Christmas Day 2012 holiday. He was on LWOP on his scheduled work day immediately before and after Christmas Day (December 22 and 26). Williams also did not receive holiday pay for the Martin Luther King, Jr. 2013 holiday. He was on LWOP on the scheduled work days both immediately before and after that holiday (January 19 and 22). Williams did receive holiday pay for New Year's Day 2013. Although he was on LWOP on his scheduled work day immediately before New Year's Day (December 29), he was on FMLA-dependent sick leave the day after (January 2), meaning he was in a pay status for the first scheduled hour after the holiday. Williams testified that he requested to be placed on paid leave on the days before and after these three holidays.

## III.    AWOL Designations

In May 2011, Williams' wife was diagnosed with breast cancer. Although she went into remission in May 2012, the cancer returned in the summer or fall of 2013 and she passed away on May 20, 2014. Williams testified that he told Principe, Walsh, and Gillispie about his wife's

diagnosis.  Between 2011 and 2013, Williams requested sick or paid leave to take his wife to treatments.  Williams testified that, at times, Principe, Walsh, and Gillispie did not approve such leave and instead placed him on LWOP.  The record does not include any specific dates on which such denials allegedly occurred or whether Williams had sick or paid leave available when he made those requests.

Williams also complains that Principe improperly designated him as AWOL between March 12, 2013, and April 16, 2013, changing his FMLA requests to AWOL designations in his time and attendance records.  But these records do not include any AWOL designations during this time period, with Williams instead paid for working or being on paid leave.

## IV.    April 9, 2013, Incident

After completing his mail route on April 9, 2013, Williams returned to the Glen Ellyn Post Office.  Williams and Principe disagree about the events that followed.  Williams testified he intended to put away mail, unload his truck, take his five-minute wash up, and then punch out for the day.  The parties agree that Principe approached him and told him to punch out immediately.  After Williams insisted that he would punch out only after taking his five-minute wash up, Williams testified that Principe threatened to call the police if he did not punch out immediately.  After Principe reiterated this, Williams responded, "then do it."  Doc. 39 ¶ 17. Principe testified that Williams became "loud and belligerent," and threatened her, indicating he had something for her and stating "I'll show you, sister."  *Id.* ¶ 20.  Feeling physically threatened, Principe testified she then called the police.  Williams claims he did not lose his temper or ever threaten Principe.  When the police arrived, Williams agreed to leave.  The police and USPS did not take further action.

Aside from this incident, Williams also testified that Gillispie and Principe sent him home on several occasions, but Williams has not identified any specific dates or details surrounding these other alleged occasions.

## V.     Williams' Initial Removal from USPS

On May 24, 2013, Ellen Smid, an eighteen-year-old, approached Williams, who was sitting in his delivery truck parked outside of the house Smid shared with her parents.  Smid approached the truck intending to save the mail carrier a trip to the front door.  Instead of encountering the regular mail carrier for that route, she encountered Williams, who was covering that route that day.  According to Smid, Williams asked her questions, including "how old [she] was, [and] what [she] wanted to pursue when [she] graduated high school," and told her "that he had this clothing line [she] should check out, and that he had a new 'Volvo' that he could take [her] for a ride in but [she] 'wouldn't have to do anything with him.'"  *Id.* ¶ 23.  Smid recounted that Williams wrote down his name, number for her, and the name of his fashion line, Clexsy, which he told her meant "sexy and classy."  *Id.*  The interaction made Smid uncomfortable, and she retreated to her house and locked the door.  About ninety minutes later, Williams returned to the Smid house to deliver a package he had forgotten to deliver earlier.  After Smid's father accepted the delivery, Smid told her father about what happened.  Smid also posted about the incident on her Facebook page.  Williams acknowledged speaking with Smid while delivering mail and admitted to complimenting her eyes, telling her about his Clexsy website and his Volvo, and giving her his telephone number.  He denied offering to give Smid a ride or asking her to model for any websites.

The day after the interaction between Williams and Smid, Smid's mother called the Glen Ellyn Post Office twice and spoke with Principe.  During the second call, Principe recalled

Smid's mother stating she did not want Williams near the Smid house. Smid's mother also asked Principe if she should call the police. Principe told her to do so if Smid felt threatened, harassed, or stalked. Smid's mother called the police that same day. Principe later told Gillispie and Jayne Duewerth, the manager of post office operations, about the incident as reported by Smid's mother. Principe did not discuss the incident with Williams.

On May 29, USPS placed Williams on off-duty status without pay, also called an emergency placement, based on the information USPS received from the Smid family. Gillispie signed the emergency placement letter. Williams testified that, in connection with this incident, Gillispie commented that Williams was "40 something years old and talking to an underage girl while on [his] route." Doc. 39-2 at 88:21–23. Williams also claims Principe and Walsh made similar comments.

After USPS issued the emergency placement, USPS' Office of the Inspector General ("OIG") investigated the incident. In a report dated June 25, 2013, OIG concluded that "Williams engaged in conduct which did not reflect favorably upon the USPS in that he gave his name, telephone number, and name of a clothing line which solicited female models to an 18 year old girl while engaged in the performance of his official duties." Doc. 39 ¶ 29. On July 11, after the OIG's investigation, USPS issued Williams a notice of removal, signed by Walsh and Gillispie. The notice charged Williams with unacceptable conduct arising from the May 24 interaction with Smid, specifying Williams violated USPS' standard of conduct, including ELM sections 665.11, 665.16, 667.16, and 667.331, as well as City Delivery Carrier Duties and Responsibilities ("M-41") section 112.28, 112.6, and 112.61.

Williams filed grievances with his union related to his emergency placement and removal. An arbitration took place on June 4, 2014. The parties settled before the arbitration

concluded. As part of the settlement, the notice of removal converted to a seven-day suspension, with Williams receiving fifty percent of his back pay. The settlement also indicated Williams would return to work on June 6, 2014. Angela Davenport, a labor relations specialist for USPS, signed the settlement on behalf of USPS. Corey Walton, a union representative from the National Association of Letter Carriers, signed the settlement on Williams' behalf. Williams disagreed with the terms of the settlement agreement.[4] Williams claims that no one told him that he should return to work on June 6 until he saw the pre-arbitration settlement agreement directing him to do so sometime between June 9 and 11, when he received the settlement documentation from a union official.

When Principe learned of the agreement to return Williams to work, she expressed her displeasure to a colleague in Florida. She told him that "[a] jerk got his job back," referring to Williams as "the biggest !!!! you know what!," the "[b]iggest jerk," an "[i]diot . . . out on EP soliciting a high senior," and a "SCUM BAG." Doc. 47-7 at 1–2.

## VI. Williams' Scheduled Return to Work and Subsequent Removal

Williams did not report to work on June 6, 2014, as provided for in the pre-arbitration settlement. That day, USPS sent Williams two letters to his address of record (on South King Drive in Chicago, Illinois), directing him to report to work on June 6 at the Glen Ellyn Post Office. Gillispie also sent Williams another letter that day, directing him to report to work on June 9. That letter was delivered to Williams' address of record on June 7. But Williams did not report to work on June 9 either. Instead, after receiving the pre-settlement arbitration letter, Williams called the USPS Integrated Voice Recognition ("IVR") system, an automated attendance call center, to request leave. This sent a notification to Principe and Gillispie that

---

[4] Williams also complains that he has never received the backpay that formed a part of the settlement agreement. The record reflects that he has continuously objected to the calculation of the backpay amount and has not signed and returned the paperwork to authorize release of the payment.

Williams had requested eighty hours of leave from June 9 through 24.  Although Williams made this request, his supervisors had to approve it.

Because Williams sought more than three days of sick leave, USPS policy required him to submit medical documentation to support the leave request.  Specifically, the USPS ELM provides that supervisors may accept employees' statements explaining their absence for sick leaves of three days or less, but that, for requests of over three days, the employee must provide medical documentation or other acceptable evidence.  For extended medical leave requests, employees need not submit such evidence more frequently than once every thirty days.  The ELM also provides that, if employees fail to provide acceptable documentation, the absence may be charged to annual leave, LWOP, or AWOL. It also provides that failure to regularly attend work may result in discipline, including removal.

After Williams did not show up to work on June 9, Principe sent him a request for medical documentation to substantiate his absence, with the letter explaining that the failure to respond may result in the absence being classified as AWOL.  Williams did not respond to the letter.  USPS then sent Williams another request for documentation on June 17.  That letter noted that Williams had called requesting leave but did not have any injury claims open.  Williams again did not respond or report to work.  Instead, Gillispie and Principe received notification on June 21 that Williams had requested another eighty hours of leave from June 20 to July 7 through the IVR system.  Gillispie then sent Williams a notice of investigatory interview on June 26, instructing Williams to appear for an investigatory interview on July 1 at 11:00 a.m. at the Glen Ellyn Post Office.  Williams did not report for the interview.  Gillispie also testified that he called Williams between three and five times to instruct him to return to work, with Principe present for at least one of these calls.

On July 5, USPS designated Williams as AWOL. On July 7, Williams again requested eighty hours of leave through the IVR system. On July 14, USPS issued Williams a notice of removal, signed by Principe and Gillispie, based on Williams' AWOL status. The notice informed Williams of his right to file a grievance within fourteen days of receipt. Although Williams continued to call the IVR system to request leave every two weeks through August 19, he did not file a grievance. Having received no grievance, per the terms of the notice of removal, USPS separated Williams from employment on August 18. USPS informed Williams of the separation in a letter dated August 29.

Nothing in the record indicates that Williams provided Gillispie or Principe with any requested documentation to support his leave requests. Williams testified that he may have spoken to Gillispie in July and told Gillispie that he was not AWOL but rather was suffering from depression and could provide medical documentation for his absence once his doctor returned from abroad. Gillispie did not recall this conversation or having received any documentation. On August 21, Williams emailed Christie Kapanowski, an EEO ADR specialist, a letter from Dr. Joseph Shoshana, which stated that Dr. Shoshana had treated Williams on a weekly basis since June 6, 2014, for depression and anxiety "stemming from emotional distress related to incidents at work and his wife's illness and subsequent death." *Id.* ¶ 39. Dr. Shoshana indicated that Williams could not work and needed continuous care. Kapanowski forwarded the letter to Ray Vaicaitis. Williams did not copy Gillispie or Principe on this email, but Williams testified he sent the letter to Gillispie and again provided it to Gillispie on August 21. Williams also testified that he provided USPS with a doctor's note and prescription from Dr. Scott Goldstein dated June 9 or 10, 2014, but the record does not include any other details about these documents. Finally, Williams claims he spoke with Jenny Stoiga, who works for USPS'

Employee Assistance Program, about his medical conditions. Both Gillispie and Principe testified they did not know that Williams had any medical condition, restrictions, or limitations at the time of the notice of removal.

Williams also testified that he did not receive any of the letters USPS sent him regarding his absences until after July 14 because he did not live at the King Drive address that USPS had on record for him. Williams claims he lived at that address until 1998, although he acknowledges that his parents lived there through at least September 2014. Nonetheless, Williams used that address in 2014 for other purposes, such as the 2013 tax return he filed on March 24, 2014. Despite the USPS ELM requiring employees to keep USPS informed of their current mailing address, Williams did not make a formal change of address request with USPS and only informed USPS' human resources department that he had moved sometime between August and October 2014.

**VII. EEO Complaints**

On June 6, 2013, Williams filed an EEO complaint claiming discrimination on the basis of race, color, sex, age, national origin, and association with a disabled person. He also claimed retaliation. Specifically, Williams alleged (1) USPS failed to provide him with holiday pay for three holidays; (2) a supervisor told him to go home fifteen minutes after he started work; (3) USPS falsified his FMLA absence requests between March 12 and April 16, 2013; (4) Principe called the police on him following an April 2013 altercation; (5) USPS placed him on emergency placement on May 29, 2013; and (6) he received a notice of removal on July 11, 2013. The EEOC granted USPS' motion for summary judgment on August 21, 2017, with USPS issuing its final agency decision on September 28, 2017.

Williams file a second EEO complaint on September 17, 2014.[5] In this complaint, he asserted discrimination on the basis of race, color, national origin, gender, age, and disability, as well as retaliation. The EEOC accepted for investigation Williams' challenge to his July 2014 notice of removal. The EEOC granted USPS' motion for summary judgment on August 15, 2017, with USPS issuing its final agency decision on September 22, 2017.

## VIII.  Alleged Comparators

Williams has identified several mail carriers at USPS' Glen Ellyn facility, claiming they are relevant comparators for his claims.[6] Thomas Bach, a Caucasian male over the age of forty, has no prior EEO activity. On September 24, 2013, Principe and Gillispie issued Bach an emergency placement for improper conduct and falsification of an official record, specifically, falsifying a signature confirmation record. Bach received a notice of removal for the same conduct. Through the grievance process, USPS reduced the notice of removal to a fourteen-day suspension. USPS did not discipline him for attendance issues.

Joanne Tricoci, a Caucasian female over the age of forty, has been disabled or on FMLA. In 2013 and 2014, she provided care for her ailing mother. She had no prior EEO activity. Walsh and Gillispie issued Tricoci discipline for her failure to maintain a regular schedule, including a letter of warning, a seven-day notice of suspension, and a fourteen-day notice of suspension. During the grievance process, USPS learned that Tricoci was in the hospital during her absences, with her leave covered under the FMLA.

---

[5] It appears that Williams initiated this complaint prior to September 2014 because in the September 17 complaint, he complains that a mediation on the complaint was rescheduled from August 22, 2014, to September 16, 2014.

[6] In addition to those discussed in this section, Williams identified Anthony Maneck as a comparator in his complaint. Because he does not seek to rely on Maneck in his response, the Court does not consider whether Maneck could serve as a comparator.

Williams testified that Ron Utsler, a Caucasian older male, had committed a crime and had a restraining order issued against him. Williams stated that USPS allowed Utsler to retire instead of terminating him. Williams also testified that Ron Pierce, a Caucasian older male, had pocketed a wallet he found on his route. Williams claims that although OIG confronted Pierce about the incident, USPS did not terminate him.

## IX.    Claimed Threats of Retaliation

Williams presents several additional pieces of evidence concerning his claims of retaliation. He has provided the Court with an EEO complaint filed by Barbara Walker, who also worked at the Glen Ellyn Post Office, contending that Gillispie and Principe subjected her to discipline because, among other things, Williams had named her as a witness in a hearing on one of his EEO complaints. Williams also submits what he claims are emails sent to him by a number of other individuals who worked at the Glen Ellyn Post Office. In the emails, these individuals indicate that they have heard Gillispie and Principe remark that, if the other employees filed EEO complaints, they would find themselves unemployed like Williams.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. To determine whether a genuine issue of fact exists, the Court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56 & advisory committee's notes. The party seeking summary judgment bears the initial burden of proving that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on mere pleadings alone but must use the

evidentiary tools listed above to identify specific material facts that demonstrate a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the Court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

## ANALYSIS

## I.     Discrimination and Retaliation Claims

Williams claims that USPS discriminated against him in violation of Title VII, the ADEA, and the Rehabilitation Act. He also claims USPS retaliated against him in violation of Title VII for his prior EEO activity. Courts previously spoke of proceeding under an indirect or direct method to prove these claims, but the Seventh Circuit has instructed that instead of using such tests, the Court should consider the evidence "as a whole" to determine whether it "would permit a reasonable factfinder to conclude that the plaintiff's [protected characteristics] caused the [adverse employment actions]." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see Monroe v. Ind. Dep't of Transp.*, 871 F.3d 495, 504–05 (7th Cir. 2017) (applying *Ortiz* to claims under the ADA and Rehabilitation Act); *Carson v. Lake Cty., Ind.*, 865 F.3d 526, 532–33 (7th Cir. 2017) (applying *Ortiz* to ADEA claim); *Lauth v. Covance, Inc.*, 863 F.3d 708, 716 (7th Cir. 2017) (applying *Ortiz* to retaliation claim).[7] This does not mean that the Court cannot consider the traditional burden-shifting test laid out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). *Ortiz*, 834 F.3d at 766 (noting that its decision does not overrule *McDonnell Douglas*). Although the parties conduct an

---

[7] To the extent differences exist in the standards for proving discrimination and retaliation under Title VII, the ADEA, and the Rehabilitation Act, the Court notes such differences as they arise.

analysis under both the previously recognized direct and indirect methods, because they essentially make the same arguments under both methods, the Court finds it more appropriate to consider the evidence as a whole in addressing whether a reasonable factfinder could determine that Williams' protected characteristics caused the complained-of adverse actions.[8] *See id.* at 765–66. First, however, because USPS challenges whether certain of Williams' claimed employment actions qualify as materially adverse, an issue applicable to both inquiries, the Court addresses the scope of Williams' discrimination claims.

### A.    Adverse Employment Actions

For purposes of Williams' discrimination claims, a materially adverse employment action is an action that involves "a significant change in employment status," *Boss v. Castro*, 816 F.3d 910, 917 (7th Cir. 2016) (quoting *Andrews v. CBOCS W., Inc.*, 743 F.3d 230, 235 (7th Cir. 2014)), and is "more disruptive than a mere inconvenience or an alteration of job responsibilities," *Nichols v. S. Ill. Univ.-Edwardsville*, 510 F.3d 772, 779 (7th Cir. 2007) (quoting *Rhodes v. Ill. Dep't of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004)). Adverse employment actions generally fall into three categories: "(1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge." *Barton v. Zimmer, Inc.*, 662 F.3d 448, 453–454 (7th Cir. 2011). The standard for showing an adverse employment action for a retaliation claim is lower than that for a discrimination claim. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006). "[A] plaintiff must only show that the employer's

---

[8] The parties do not neatly separate their arguments with respect to each of the various alleged bases of discrimination and retaliation. The Court has done its best to sort out the arguments and evidence into the appropriate buckets.

action would cause a 'reasonable worker' to be dissuaded from making or supporting a charge of discrimination." *Chaib v. Indiana*, 744 F.3d 974, 986–87 (7th Cir. 2014) (quoting *White*, 548 U.S. at 68), *overruled on other grounds by Ortiz*, 834 F.3d 760. As demonstrated below, the different standards do not affect the Court's analysis in this case.

USPS acknowledges that Williams suffered three adverse employment actions: the 2013 emergency placement, the 2013 notice of removal, and the 2014 notice of removal. But USPS argues that the alleged incidents regarding holiday pay, improper AWOL designations, being sent home early, and Principe calling the police on Williams do not rise to the level of adverse employment actions. Williams does not meaningfully respond to USPS' argument, stating instead that "even assuming, without conceding, that the instances referenced by Defendant . . . did not individually constitute adverse employment action, a reasonable jury can conclude that these incidents, together, created unbearable work conditions and created a hostile work environment." Doc. 53 at 5. But in doing so, Williams effectively concedes that these incidents individually do not amount to adverse actions, and the Court need not address the viability of these individual actions further. *See Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011) (the court is not "obliged to research and construct legal arguments for parties, especially when they are represented by counsel"); *Bonte v. U.S. Bank, N.A.*, 624 F.3d 461, 466 (7th Cir. 2010) ("Failure to respond to an argument . . . results in waiver."); *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009) ("Perfunctory and undeveloped arguments as well as arguments unsupported by pertinent authority are waived.").

Williams also cannot proceed on his newly-raised contention that USPS created a hostile work environment. Although a hostile work environment can amount to an adverse employment action, Williams cannot change his theory in response to USPS' motion for summary judgment.

*See Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996) ("A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment."). More importantly, as with any of the individual actions, Williams has not sufficiently developed his argument to allow the Court to determine whether a hostile work environment existed at the Glen Ellyn Post Office. *See Nelson*, 657 F.3d at 590; *Elst*, 579 F.3d at 747. Therefore, the Court will not consider this belated attempt to assert a hostile work environment and instead finds it appropriate to only address whether USPS acted discriminatorily with respect to the 2013 emergency placement and notice of removal and the 2014 notice of removal.[9]

### B.    Causation

Having determined the actionable adverse actions, the Court turns to an analysis of whether any of Williams' protected characteristics caused these actions. Williams may demonstrate causation through evidence of, for example, comments or animus toward the protected group, suspicious timing, more favorable treatment of similarly situated employees, or pretext. *Monroe*, 871 F.3d at 504. Although Williams' Title VII status-based discrimination claims require only that the protected characteristic was a motivating factor in the employer's actions, Williams' age and retaliation claims require but-for causation, meaning "proof that the unlawful retaliation would not have occurred in the absence of the alleged wrongful action or actions of the employer." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 343, 360, 133 S.

---

[9] Williams also appears to contend for the first time that USPS' failure to pay him backpay, as provided for in the pre-arbitration settlement, amounts to a breach of the settlement agreement and an adverse action. The Court similarly cannot consider this as a basis for his discrimination claims or as a separate breach of contract claim, where Williams belatedly raises the argument in an attempt to avoid summary judgment and his complaint includes no mention of issues related to the pre-arbitration settlement. *See Conner v. Ill. Dep't of Nat. Res.*, 413 F.3d 675, 679 (7th Cir. 2005) ("Conner's raising of the temporary assignment pay issue for the first time in her response to a motion for summary judgment thus amounted to adding a new count of discrimination to the lawsuit, or amending her original complaint."); *Whitlock v. Williams Lea, Inc.*, No. 16 CV 6347, 2019 WL 1382267, at *5 (N.D. Ill. Mar. 27, 2019) (refusing to consider retaliation claim where complaint did not mention retaliation or include facts about termination, with plaintiff raising the issue for the first time in the summary judgment response brief).

Ct. 2517, 186 L. Ed. 2d 503 (2013) (retaliation); *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009) (age discrimination). While Williams briefly acknowledges the need for but-for causation to establish his retaliation claim, USPS does not separately argue that Williams cannot meet the higher causation standard for his age and retaliation claims, instead speaking generally about his failure to establish a causal link for all claims, and so the Court treats the claims in the same way for summary judgment purposes.

### 1. 2013 Emergency Placement and Notice of Removal[10]

To create a disputed issue of fact as to causation with respect to the 2013 emergency placement and notice of removal, Williams points to statements and actions by his supervisors allegedly showing biases against his protected groups, as well as alleged evidence of comparators and pretext. First, Williams highlights a statement he claims Walsh made in 2012 about how Williams did not think he had to follow the rules because he was black. Without anything more, such an isolated remark, unconnected to the 2013 emergency placement and notice of removal and made by a non-decisionmaker over a year before these actions, does not create a question of fact. *See Egonmwan v. Cook County Sheriff's Dep't*, 602 F.3d 845, 850 (7th Cir. 2010) (for a stray remark to establish discriminatory motivation, it must be "(1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action"). And the record does not suggest any basis to connect Principe's call to the police in April 2013 to any of Williams' protected characteristics. *See Berry v. Delta Airlines, Inc.*, 260 F.3d 803, 808 (7th Cir. 2001) ("Title VII proscribes only workplace discrimination on the basis of sex, race, or some other status that the statute protects; it is not a 'general civility code' designed to purge the workplace of all boorish or even all harassing conduct.").

---

[10] Based on Williams' response, the Court does not understand him to claim retaliation or disability discrimination with respect to the 2013 emergency placement or notice of removal.

Next, Williams claims he has identified similarly situated employees outside of his protected classes whom USPS treated more favorably. "Similarly situated employees 'must be directly comparable to the plaintiff in all material respects,' but need not be identical in every conceivable way." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). Typically, a plaintiff must at least show that the comparators "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 847. For purposes of the 2013 emergency placement and notice of removal, Williams has identified three potential comparators: (1) Bach, a Caucasian male over the age of forty who is not disabled; (2) Utsler, a Caucasian older male; and (3) Pierce, a Caucasian older male. None of these individuals engaged in protected activity.

Initially, Williams has produced no admissible evidence to allow the Court to consider Utsler and Pierce as proper comparators. *See Durkin v. City of Chicago*, 341 F.3d 606, 614 (7th Cir. 2003) (plaintiff, not defendant, has the burden to prove that defendant treated similarly situated employees more favorably). Although Williams has presented his own testimony about Utsler and Pierce, his general and conclusory testimony as to their protected characteristics and his understanding of the discipline USPS imposed on them cannot defeat summary judgment. *See Boss*, 816 F.3d at 919 (speculation about comparators' work histories does not suffice to show similarly situated employees); *Gates v. Caterpillar, Inc.*, 513 F.3d 680, 690 (7th Cir. 2008) (plaintiff's limited information on comparators was "too vague to allow this Court to determine whether Gates and the men are 'similarly situated'"); *South v. Ill. Envtl. Prot. Agency*, 495 F.3d 747, 753 (7th Cir. 2007) (plaintiff failed to identify similarly situated employees where he identified individuals with the same employment responsibilities and supervisor but did not

18

present information as to other "salient characteristics" that would allow a trier of fact to determine that the employer treated them differently); *Oest v. Ill. Dep't of Corr.*, 240 F.3d 605, 614 (7th Cir. 2001) (a Title VII plaintiff's "own uncorroborated, conclusory statements that similarly situated co-workers were treated differently" is not enough to defeat summary judgment), *overruled by Ortiz*, 834 F.3d 760.

Additionally, none of these individuals could serve as proper comparators for Williams' age discrimination claim. *See Zaccagnini v. Charles Levy Circulating Co.*, 338 F.3d 672, 675 (7th Cir.2003) (for purposes of age discrimination claim, a comparator may be a substantially younger person, regardless of whether that person is under the age of forty); *Hartley v. Wis. Bell, Inc.*, 124 F.3d 887, 892–93 (7th Cir.1997) (ten-year age difference with comparator is presumed substantial, regardless of whether the comparator also falls within the protected class). Bach is at least ten years older than Williams, and Williams testified that both Utsler and Pierce are older than him as well.

Finally, Williams argues that Bach engaged in similar if not more serious conduct— falsifying a customer's signature—but kept his job after the incident. But USPS did not treat Bach more favorably. Once USPS learned of the signature incident, USPS placed Bach on emergency placement and, after an investigation, issued Bach a notice of removal. Similarly, after USPS received a complaint about Williams' interaction with Smid, USPS placed Williams on emergency placement and, after an investigation, issued Williams a notice of removal. Although it appears that the subsequent grievance process concluded more quickly for Bach than for Williams, the grievance process is not at issue here. But ultimately, that process resulted in USPS reinstating both Bach and Williams to their jobs. Because the record does not allow an

inference that USPS treated Bach more favorably, Williams cannot rely on him as a comparator to suggest causation.

USPS also argues that Williams cannot demonstrate that USPS provided pretextual reasons for the 2013 emergency placement and notice of removal. "Pretext requires more than showing that the decision was mistaken, ill considered or foolish, and so long as the employer honestly believes those reasons, pretext has not been shown." *Formella v. Brennan*, 817 F.3d 503, 513 (7th Cir. 2016) (citation omitted). Williams can "demonstrate pretext directly by showing that 'a discriminatory reason more likely motivated' [the adverse actions], or indirectly by showing that [USPS'] explanations are 'unworthy of credence.'" *Senske v. Sybase*, 588 F.3d 501, 507 (7th Cir. 2009) (citation omitted). The pretext inquiry focuses on "whether the employer's stated reason was honest, not whether it was accurate, wise or well-considered." *Stewart v. Henderson*, 207 F.3d 374, 378 (7th Cir. 2000).

USPS maintains that it put Williams on emergency placement immediately after the Smid incident based on Smid's mother's report of the incident and her expressed fear he could cause harm to or harass to her high school aged daughter. And USPS states it based the 2013 notice of removal on the OIG's investigation, which concluded that "Williams engaged in conduct which did not reflect favorably upon the USPS," Doc. 39 ¶ 29, and its determination that this unacceptable conduct violated several of USPS' standards of conduct and policies.

First, Williams argues that USPS' reasons for the 2013 emergency placement and notice of removal are pretextual because no USPS policy prevented him from having "a mutually friendly conversation with an adult postal customer." Doc. 53 at 13. But the emergency placement and notice of removal both cited USPS policies as the bases for the actions, *see* Docs. 40-12 & 40-13. Williams cannot avoid the application of these rules by recharacterizing the

incident in favorable terms.  And even if Williams viewed the conversation as "mutually friendly," Smid and her mother did not view it that way and the OIG's investigation substantiated that Williams engaged in improper conduct.  *See Lauth*, 863 F.3d at 715–16 ("Lauth's belief that he was performing his job adequately is not relevant to the question of whether Covance believed it had a legitimate, non-discriminatory basis to terminate him."); *Mirocha v. Palos Cmty. Hosp.*, 240 F. Supp. 3d 822, 839 (N.D. Ill. 2017) (plaintiff could not create an issue of fact by claiming he was performing adequately or challenging his supervisors' assessment of his performance).  While Williams may believe that his actions did not warrant termination, the Court does not sit as a "super personnel department that second-guesses employer's business judgments."  *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (citation omitted) (internal quotation marks omitted); *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 464 (7th Cir. 2014) ("This court has repeatedly stated that it is not a super-personnel department that second-guesses employer policies that are facially legitimate. . . . A court cannot interfere because an employer's decision is unwise or unfair.").

Williams also argues that the fact that USPS imposed two forms of discipline for the same conduct demonstrates pretext.  Williams claims that, because USPS brought him back to work after the emergency placement but before issuing the notice of removal, USPS subjected him to double jeopardy for the same incident.  Williams relies on a 1977 arbitrator's decision that USPS did not have just cause to discharge a grievant for the same conduct for which it had placed her on an emergency placement but then allowed her to return to work.  Doc. 47-14 at 6–8.  Williams correctly points out that "an agency cannot impose a disciplinary or adverse action more than once for the same misconduct."  *Cooper v. Dep't of Veterans Affairs*, 2012 M.S.P.B. 23, ¶ 5.  Although USPS' issuance of a notice of removal, on its face, appears to violate this

prohibition on double jeopardy, the Court only considers the honesty of USPS' stated reason for his termination, not its validity or reasonableness.[11] *Seymour-Reed v. Forest Pres. Dist. of DuPage Cty.*, 752 F. App'x 331, 335 (7th Cir. 2018). Williams does not provide any evidence indicating a deviation from USPS' internal employment procedures. *See Jajeh v. Cty. of Cook*, 678 F.3d 560, 572–73 (7th Cir. 2012) (finding plaintiff's speculative arguments about what went into employer's decision not to promote were not sufficient evidence to show employer failed to follow its internal employment procedures). And the 1977 arbitrator decision alone cannot give rise to an inference that USPS did not believe the reason given for the 2013 notice of removal. *See Guinto v. Exelon Generation Co.*, 341 F. App'x 240, 246–47 (7th Cir. 2009) (no pretext existed based on a violation of policy where employer "truthfully stated why it rejected [plaintiff's] application, but [that] explanation violated its own policies"). Williams does not point to evidence that Principe, Gillispie, or Walsh knew of this double jeopardy prohibition or willfully ignored it in issuing the notice of removal. *See Ference v. Aon Consulting, Inc.*, No. 07 C 2918, 2008 WL 2098037, at *11–12 (N.D. Ill. May 19, 2008) (plaintiff could not show pretext based on failure to follow alleged policy where no evidence that employees knew of policy or, assuming the policy existed, that employer deviated from it for discriminatory reason). Instead, the evidence only allows the interpretation that USPS removed Williams from his position based on the findings of the OIG investigation. Therefore, without any evidence of discriminatory animus contributing to his receipt of the emergency placement and notice of removal in 2013, a reasonable juror could not find that USPS undertook these adverse actions based on any of Williams' protected characteristics.

---

[11] Moreover, the parties do not present the Court with sufficient facts surrounding the decision to bring Williams back to work prior to issuing him a notice of removal. Any issues unrelated to his discrimination claims that Williams had surrounding that notice of removal were settled in the pre-arbitration settlement and are not properly before the Court here.

## 2.      2014 Notice of Removal

As for the 2014 notice of removal, Williams argues that USPS acted pretextually and treated similarly situated employees differently.  He also relies on evidence of alleged suspicious timing and discriminatory statements.  With respect to pretext, USPS represents that it issued the notice of removal because Williams did not return to work as instructed and failed to substantiate his extended absence from work.  Williams claims this stated reason for his removal amounts to pretext because he informed USPS of his need for FMLA leave.  But the fact that Williams called the IVR system to request leave did not excuse him from providing medical documentation to support that request because USPS' policy requires documentation for sick leave requests exceeding three days.  Here, Williams requested leave for eighty hours at a time, necessitating documentation.  Williams does not dispute that he failed to provide documentation until after USPS issued the notice of removal.  While he claims he only received the letters requesting documentation after the fact, nothing in the record suggests that Principe and Gillispie knew of this at the time USPS issued the notice.  Additionally, Williams had an obligation to keep USPS apprised of his current address and acknowledges he did not do so until after his removal.  Moreover, although Williams claims he informed Gillispie that he would provide documentation once his doctor returned to the United States, this does not change the fact that, at the time Gillispie and Principe issued the notice of removal, Williams had failed to provide the required documentation despite having received several warnings.  And USPS policies specifically provide for the possibility of termination upon the failure to report to work and provide medical documentation to excuse any such absences.  Gillispie and Principe provided Williams with numerous opportunities to substantiate his absence, but he did not do so in a timely fashion.

Williams, however, argues that the Court should consider Principe's derogatory comments about Williams returning to work to find USPS' reasons unworthy of credence. While Principe's comments about Williams certainly do not reflect well on her, nothing in the record suggests these comments related to any of Williams' protected characteristics. *See Fulmore v. Home Depot, U.S.A., Inc.*, 423 F. Supp. 2d 861, 877–78 (S.D. Ind. 2006) ("[E]vidence that Baven's supervisors were not kind in reprimanding or otherwise communicating with her and Haslett, while perhaps unfortunate, does not demonstrate or raise the inference that Baven was not promoted because of her race.").

Alternatively, Williams may show pretext by pointing to comparator evidence. *See Coleman*, 667 F.3d at 857–858 ("Where the plaintiff argues that an employer's discipline is meted out in an uneven manner, the similarly-situated inquiry dovetails with the pretext question."). Williams identifies one potential comparator for purposes of the 2014 Notice of Removal: Joanne Tricoci, who also had attendance issues. Tricoci is a Caucasian female over the age of forty who did not engage in protected activity but has been disabled and on FMLA, making her a potential comparator for Williams' race, gender, national origin, and retaliation claims.[12] USPS engaged in progressive discipline with Tricoci for her unexcused absences, issuing her a letter of warning, a seven-day notice of suspension, and a fourteen-day notice of suspension, but stopping short of a notice of removal. USPS contends that it ultimately discovered that Tricoci's absences were covered by the FMLA and so argues that this sufficiently differentiates her from Williams. Although they may have had somewhat different situations, the inquiry does not require "perfect congruence" between the two. *See Donley v.*

[12] Williams has not identified a comparator for his disability claim. USPS also argues he cannot prevail on this claim because he cannot demonstrate USPS knew of his depression before issuing the notice of removal. Although a question of fact exists on that issue, with Williams testifying that he informed Gillispie before that time, this dispute ultimately makes no difference in the Court's analysis, where Williams does not present any evidence of causation related to his claimed disability.

*Stryker Sales Corp.*, 906 F.3d 635, 639 (7th Cir. 2018) ("Perfect congruence is not required, however. The question is whether the two employees are situated similarly enough for reasonable comparison."). A reasonable juror could find Williams and Tricoci engaged in comparable behavior and question why USPS immediately issued Williams a notice of removal instead of engaging in progressive discipline, as it did with Tricoci. This is particularly the case where USPS relied on the subsequent receipt of medical information to excuse Tricoci's absences but did not do the same for Williams. Therefore, Williams has at least raised a question of fact as to whether USPS treated Tricoci differently with respect to attendance issues and so acted with discriminatory animus for purposes of his race, gender, national origin, and retaliation claims related to the 2014 notice of removal.

Finally, to further buttress his retaliation claim, Williams argues that the evidence suggests USPS retaliated against him because it issued the notice of removal shortly after receiving an EEO ruling that found that USPS retaliated against Williams in 2010. "Although suspicious timing alone is rarely enough to create an inference of retaliatory motive, it can sometimes raise an inference of a causal connection, especially in combination with other evidence." *Gracia v. SigmaTron Int'l, Inc.*, 842 F.3d 1010, 1021 (7th Cir. 2016). When combined with the evidence of USPS' apparent uneven application of discipline to Tricoci, a jury could infer that USPS actually issued the 2014 notice of removal not because of his absences but rather in retaliation for his protected activity.[13] Therefore, the Court allows

---

[13] Williams also argues he has evidence from other Glen Ellyn Post Office employees of statements Principe and Gillispie allegedly made about retaliating against anyone who engaged in protected activity. Williams, however, has not provided the Court with this evidence in admissible form. *See Taylor v. Catholic Charities of Archdiocese of Chicago*, No. 17 CV 2380, 2019 WL 1168115, at *5 (N.D. Ill. Mar. 13, 2019) (emails and statements not admissible where they were not sworn under oath or made under penalty of perjury and so did not qualify as affidavits or declarations under Rule 56(c)(4)). To the extent Williams can properly introduce this evidence at trial, it could also go toward establishing the causation element of his retaliation claim.

Williams to proceed on his claims of race, gender, and national origin discrimination and retaliation related to the 2014 notice of removal.

## II.      Associational Disability Claim

Williams also brings a separate claim that USPS discriminated against him because of his association with his wife, who had a disability. *See Hale v. Pace*, No. 09 C 5131, 2011 WL 1303369, at *4 (N.D. Ill. Mar. 31, 2011) (recognizing associational discrimination claim under the Rehabilitation Act). The Seventh Circuit has identified three situations falling within the scope of an associational discrimination claim, which demonstrate the employer's "motive to discriminate against a nondisabled employee who is merely associated with a disabled person." *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 702 (7th Cir. 2004). These situations are: (1) expense, where the associated individual's disability proves costly to the employer; (2) disability by association, where the employer fears the employee may contract a disease or develop the disability as well; and (3) distraction, where "the employee is somewhat inattentive at work because his spouse or child has a disability that requires his attention, yet not so inattentive that to perform to his employer's satisfaction he would need an accommodation." *Id.* at 700. To establish an associational discrimination claim, Williams must demonstrate: (1) he qualified for the job, (2) he suffered an adverse employment action, (3) USPS knew at the time that he had a relative with a disability, and (4) his case falls into one of the three categories of expense, disability by association, or distraction. *Magnus v. St. Mark United Methodist Church*, 688 F.3d 331, 336–37 (7th Cir. 2012). Ultimately, the evidence must demonstrate that "it is more likely than not the employer took the adverse action . . . because of the plaintiff's association with a disabled individual." *Id.*

USPS argues that Williams cannot show that his case falls within any of the three recognized categories of expense, disability by association, or distraction. Williams responds that his case fits into the distraction and expense categories. He claims he falls within the expense category because USPS had concerns about his requests for paid leave to attend his wife's treatments. But the record does not support Williams' claim that USPS placed him on AWOL status when he should have received pay for annual or sick leave. Nor does the record support a finding that USPS took any of the actionable adverse employment actions—issuing the 2013 emergency placement and notice of removal or the 2014 notice of removal[14]—because Williams was somewhat inattentive at work because of his wife's disability. No evidence of inattentiveness appears in the record. Therefore, because the evidence does not create a question of fact as to whether Williams' case falls into one of the recognized categories and Williams does not point to any other evidence that would allow the inference that USPS issued him the emergency placement or notices of removal because of his association with his wife, the Court grants judgment for USPS on the associational disability claim.

## CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part USPS' motion for summary judgment [43]. The Court enters judgment for USPS on Williams' claims, except with respect to his claims of race, gender, and national origin discrimination and retaliation related to the 2014 notice of removal.

Dated: October 16, 2019

SARA L. ELLIS
United States District Judge

---

[14] Because Williams' wife died in May 2014, the Court also questions whether Williams can demonstrate he had an association with an individual with a disability at the time of the 2014 notice of removal.